UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CHANTALE ONIASSE,

Plaintiff

v. Case No. 6:17-cv-1247-Orl-37KRS

KEITH HERNANDEZ; and ORANGE COUNTY SHERIFF,

Defendants.

---

**ORDER**

This 42 U.S.C. § 1983 action arises from a 2014 encounter between Plaintiff Chantale Oniasse and Defendant Keith Hernandez, a then-Orange County Deputy Sheriff. Plaintiff brings two constitutional claims for false arrest/detention and excessive force against Deputy Hernandez (Doc. 29, ¶¶ 42–50), and two state-law claims for false arrest/detention and battery against the Orange County Sheriff in his official capacity (*id.* ¶¶ 51–60). Defendants moved for summary judgment, asserting qualified immunity for the claims against Deputy Hernandez and other defenses for the state-law claims. (Doc. 37 ("**Motion**").) Plaintiff, now proceeding *pro se* (*see* Doc. 36), did not respond. (*See* Doc. 38.) This Order follows.

## I. BACKGROUND[1]

### A. Plaintiff's "Best Case"

The evening of Thursday, August 21, 2014 started off like any other for Plaintiff Chantale Oniasse, Pastor at Source of Life Church in the Pine Hills area of Orlando. (Doc. 40-1, pp. 110:24–111:25.) The church was holding its weekly evening service, where congregants gathered anytime after 8:30 p.m. to worship. (*Id.* at 104:23–105:12.) Service could include midnight prayer or dancing, with musicians performing and parishioners singing along. (*Id.* at 105:4–12, 154:4–10:18–20.) This often lasted well into the night and "got loud." (*Id.*) On a given night, between eighty or ninety people could filter through, and on August 21, 2014, in the ten o'clock hour, around 15–20 congregants were present. (Doc. 40-2, p. 230:4–232:16.)

Sometime in that hour, a woman entered the church in an "aggravated" state. (Doc. 37-2, pp. 8:7, 9:12–10:19.) Pastor Oniasse believed she was "drunk and violent." (Doc. 40-2, p. 152:11.) In tow was her five-year-old daughter. (Doc. 37-2, pp. 6:18–20, 9:18.) The woman lived across the street from the church and sought to complain about the noise at behest of her octogenarian grandmother. (*Id.* at 6:6–8, 7:11–8:17.) So she walked in, through the lobby to the sanctuary where service was taking place and started asking those present to turn the music down and stop being loud. (Doc. 40-2, pp. 152:13–21,

---

[1] The facts recited here are not the actual facts of the case. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). Rather, they reflect Plaintiff's "best case"—that is, the Court must consider the facts in the light most favorable to Plaintiff. *See Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005); *see also Walker v. City of Riviera Beach*, 212 F. App'x 835, 837 (11th Cir. 2006).

153:10–11; Doc. 37-2, pp. 8:12–17, 9:21–10:3.) Screaming, the woman told the parishioners she was going to unplug the music and microphones because of the noise. (Doc. 40-2, p. 157:14–23.) The woman was later identified as Sandra Ray Burnham ("**Ms. Ray**"). (*Id.* at 179.)

When Ms. Ray first came in, Pastor Oniasse was in the church office with her son. (*Id.* at 152:13–21, 153:10–11.) The usher posted in the lobby knocked on the office door and alerted Pastor Oniasse that a woman came into the sanctuary distracting the service. (*Id.*) Pastor Oniasse then left the office and went into the sanctuary, where she saw Ms. Ray in the front with her daughter "screaming" about the noise. (*Id.*) On seeing Ms. Ray "acting up," Pastor Oniasse instructed another churchgoer, Witlan Saint Hilaire ("**Witlan**") to dial 9-1-1. (*Id.* at 154:21–155:3.) Pastor Oniasse sought police intervention because the church couldn't "handle" Ms. Ray and a police officer was "the only person who can stop [Ms. Ray] from coming inside" and intruding on the service. (*Id.*) She told Witlan to report to the police that someone came into their church "in the front trying to make chaos," and have the police "pick her up or remove her." (*Id.* at 155:14–21.)

According to Pastor Oniasse, Ms. Ray then left the church because her daughter was crying. (*Id.* at 155:24, 161.) She came back about ten minutes later because the music hadn't stopped. (*Id.* at 161:19–25.) The second time, Ms. Ray was restricted to the lobby, as the doors to the sanctuary were closed. (*Id.* at 162:2–4.) When she came back, Ms. Oniasse reports that she told Ms. Ray the police had been called, and Ms. Ray responded by taking out her cell phone to snap a picture of Ms. Oniasse. (*Id.* at 164:18–165:7, 166.) The two exchanged words, and Ms. Ray threw her phone at Ms. Oniasse before running

away. (*Id.* at 166.) Pastor Oniasse instructed Witlan to call the police again; when she did, the dispatcher told Witlan that there was an officer in the area who was supposed to come after the first call but was taking longer than expected. (*Id.* at 174:3–10.) Pastor Oniasse and Witlan moved outside to wait for the police. (*Id.* at 167:24–168:10.)

Ms. Ray returned a third time, asking for her phone back while Pastor Oniasse and Witlan were standing outside the church. (*Id.* at 166–68.) Pastor Oniasse responded that she wasn't going to return the phone until the police came; she kept it so the police would know Ms. Ray was the person who came into the church. (*Id.*) Ms. Ray left again, and they stayed outside, waiting. (*Id.* at 170:16–17.) Some minutes passed until a police officer—Deputy Hernandez—approached the two women standing outside. (*Id.* at 178:16–179:23.) Pastor Oniasse recalled other people there as well: her son and two other parishioners, Carline and Evonett. (*Id.* at 185:22–187:12.) Without saying anything, Deputy Hernandez went up to Witlan and grabbed her arm to handcuff her. (*Id.* at 178:16–179:23.) Witlan immediately reacted by saying it wasn't her. (*Id.*) Deputy Hernandez asked, "who have altercation with Sandra? [sic], who has the problem with Sandra?" (*Id.*) Pastor Oniasse responded that she did, so Deputy Hernandez took his handcuffs and grabbed her arms to place them behind her back. (*Id.*)

At once, Pastor Oniasse started talking to Deputy Hernandez, asking him how he was arresting her when she was the one who called the police based on a woman coming into the church. (*Id.* at 180:13–21.) Specifically, she recounted saying, "sir, I was the one who called you. I'm in my church. Why would I be the one who get arrested and Sandra is the one to come in out church to do – to make the scene and you are arresting me?" (*Id.*

at 181:6–13.) Deputy Hernandez then started getting aggressive with her after handcuffing her, pushing her "violently." (*Id.* at 180:19–21, 181: 6–13.) At no point did he answer her questions, tell her she was under arrest, or recite her *Miranda* rights. (*Id.* at 181:14–23.)

At the same time, the others outside started protesting Deputy Hernandez's actions. (*Id.* at 182–89.) Witlan told him that his actions weren't "right"—they called the cops and now he was arresting her pastor. (*Id.* at 182:15–183:19.) As did Evonett, who immediately said to Deputy Hernandez, that's not right, you can't do that, don't arrest my pastor, she didn't do anything. (*Id.* at 185:22–187:12.) Carline started screaming and crying, saying it's not fair and that Deputy Hernandez couldn't do this. (*Id.* at 183:20–184:14.) Similarly, Pastor Oniasse's son started crying while trying to talk to Deputy Hernandez, pleading, don't arrest my mom, don't kill my mom. (*Id.* at 184:15–185:11.) Yet Deputy Hernandez "didn't listen" to anyone, even though all present let him know that they were the ones who placed the call into the police and it wasn't fair to now arrest Pastor Oniasse. (*Id.* at 187:12, 188:17–18.)

Those outside were soon joined by additional parishioners, as after Deputy Hernandez handcuffed Pastor Oniasse, Witlan went inside and told the congregation what was happening. (*Id.* at 190:4–10.) The group outside voiced the same concerns to Deputy Hernandez, who started leading Pastor Oniasse away from the church to his vehicle. (*Id.* at 187:18–21, 190:11–191:2.) While they were walking, Pastor Oniasse reported that Hernandez cursed at her, telling her to walk faster and telling the crowd to stop following them. (*Id.* at 192:19–193:8.) He said to the crowd, "shut up, shut up, you

black nigger," telling them he'd shoot. (*Id.* at 193:12–14, 194:2–6, 195–196:1.) He said the same to Pastor Oniasse, who he pushed more and told to walk faster as the others came out. (*Id.* at 198:18–199:20.) Pastor Oniasse then fell on her knees because of a "big dip" in the church parking lot. (*Id.* at 200:13–21, 202:18–203:3.) Deputy Hernandez pulled her off the ground by her handcuffs to keep walking. (*Id.* at 203:3.)

As they came to cross the street, Pastor Oniasse instructed the others to not follow them across. (*Id.* at 205:7–206:1.) They walked up to Deputy Hernandez's vehicle, he opened the door and pushed her in the backseat. (*Id.* at 219:16–220:3.) Even though her left leg was still outside the vehicle, he began closing the car door and hitting her leg with the car door. (*Id.* at 219:16–220:3.) All this time, Deputy Hernandez was cursing at Pastor Oniasse, telling her, "put your mother fucking feet inside, you black bitch." (*Id.* at 222:1–2.) She told him she couldn't, and he responded by saying, "I'll put your mother fucking feet inside," and pushed her feet with his shoe inside the car. (*Id.* at 222:2–10.) He then left her inside the car without air conditioning on. (*Id.* at 222:17.)

By then, the crowd of 15-20 parishioners had gathered on the grass by the church, not by the car. (*Id.* at 233:9–24.) Pastor Oniasse noticed additional blue lights from other patrol cars once she was placed in the car, a sight which brought her relief that someone would hear her side of the story. (*Id.* at 234:4–25.) The supervisor emerged from his car, and Witlan spoke with him, telling him that Pastor Oniasse was inside Deputy Hernandez's car. (*Id.* at 235:1–23.) The supervisor approached the car, opened the door, and took off Pastor Oniasse's handcuffs. (*Id.* at 235:15–23.) With the arrival of these other officers, according to Pastor Oniasse, Deputy Hernandez was put in another police car.

(*Id.* at 237:11–19.)

After being released, Pastor Oniasse spoke to the supervisor and other officer present. (*Id.* at 238:7–25.) She explained to them that she didn't know why she was arrested and Deputy Hernandez didn't read her her rights. (*Id.*) The supervisor told her that Deputy Hernandez called in a confirmed armed robbery so that's why all the police officers showed up. (*Id.*) She asked how could she have robbed Ms. Ray, as Pastor Oniasse was in her church. (*Id.* at 238:14–22.) The supervisor responded, "well, he's new," referring to Deputy Hernandez. (*Id.* at 238:23–239:4.) He asked Pastor Oniasse where Ms. Ray's phone was, and she told him it was on the table in the lobby. (*Id.* at 279:11–280:16.) He then had Deputy Hernandez come out and apologize to her. (*Id.* at 238:2–239:10.) In front of the supervisor and other officer, Deputy Hernandez issued his apology, saying, "I'm sorry for what happened." (*Id.* at 241:4–24.) She told him he mistreated her. (*Id.* at 241:4–242:10.) She also told the officers she wanted to press charges against Ms. Ray for disrupting the services and throwing the phone at her. (*Id.* at 271:1–23.) The supervisor asked Pastor Oniasse to write a report, but she was shaking and couldn't write. (*Id.* at 243: 1–20.) The supervisor spoke to her more, telling her to calm down and take a deep breath. (*Id.*) He also told her "they're very sorry for what happened to [her]." (*Id.* at 243:12–13.)

The supervisor stayed on scene for a while to talk to everyone, and then everyone went inside. (*Id.* at 247:16–20.) The officers tried checking for footage from the church's security cameras, but they weren't working. (*Id.* at 280:11–25.) They then retrieved the phone from inside the church and left. (*Id.* at 280:11–25.) The night concluded with Pastor

Oniasse going inside, ending service, and then going home. (*Id.* at 247:21–24.)

At home, Pastor Oniasse felt pain in her shoulders and went to the emergency room the next day. (*Id.* at 251:1–20.) Her knee also acted up following this event, so she went to the hospital and was given crutches. (*Id.* at 261.) Some time later, the State Attorney's office phoned her, asking if she'd like to continue proceedings against Ms. Ray. (*Id.* at 271:24–273:14.) She told them that she wasn't interested in pursuing charges against Ms. Ray; rather, she sought to press charges against Deputy Hernandez for "bullying [her] like [an] animal." (*Id.* at 272:11–20.) But when the State Attorney's office called again, she told them not to call anymore. (*Id.* at 272:24–273:14.)

**B. Deputy Hernandez's Version**[2]

According to Deputy Hernandez, the events that evening unfolded quite differently. The Court recites his version, keeping in mind that where his story conflicts with Pastor Oniasse's sworn deposition testimony, the Court accepts Pastor Oniasse's at this stage. *See Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006).

On August 21, 2014, Deputy Hernandez was assigned to patrol the Pine Hills area of Orlando for the midnight shift. (Doc. 37-1, 7:19, 12:4–17.) At this time, he was three-and-a-half months out from riding along with a field training officer. (*Id.* at 49:4–7.) He had a "zone partner" patrolling the same area but was alone in his vehicle. (*Id.* at 12:14–20.) His supervisor that night was Corporal Irizarry. (*Id.* at 7:8–15.)

[2] The Court relies on Deputy Hernandez's deposition for his version of the events leading up to Pastor Oniasse's handcuffing and detention. (Doc. 37-1.) Deputy Hernandez also submitted an affidavit that lacks many key details revealed in the deposition. (*See* Doc. 37-4.)

While on patrol, a call came in about a disturbance reporting a suspicious person at the Source of Life Church, which Deputy Hernandez took. (*Id.* at 25:8–12.) As he was en route there, another call came in reporting a possible robbery. (*Id.* at 25: 15–16.) The dispatcher announced via radio that a robbery had just occurred, "a complaint of a female of a cell phone," given "Code 3" priority at "2254" hours. (*Id.* at 13:8–21.) As Code 3 meant the highest priority, Deputy Hernandez responded to the report by telling the dispatcher to "break [him] from his previous call" and route him to the robbery. (*Id.* at 13:24–14:25; *see also id.* at 18:12–18.) Two other officers radioed in, Deputy Matthew Bishop and Corporal Irizarry. (*Id.* at 15:4–25.) The dispatcher let them know "that the suspect is a [sic] the street at the church. The female grabbed the phone from the complaint [sic]." (*Id.* at 15:17–19.)

Immediately after, Deputy Bishop asked whether "she still [had] eyes on the suspect." (*Id.* at 16:3–4.) The dispatcher couldn't answer (*id.* at 5–6), and Deputy Bishop said, "It might be related to that 13 p 134a that I was going to. It's right around the corner." (*Id.* at 18: 20–22; *see also id.* at 16:7–9, 17:4–5, 18:8–10.) Translated, Deputy Bishop radioed that the robbery call "may be related to the other call [Deputy Hernandez] was going to"—the "suspicious person" from the church Deputy Hernandez was responding to when the robbery call came in. (*Id.* at 18:8–9, 18–19.) So Deputy Hernandez knew going in that these two calls were "possibly" related, and their relation was confirmed when he "got on scene." (*Id.* at 25:23–26:6.)

On arrival at Ms. Ray's house, Deputy Hernandez radioed in. (*Id.* at 19:4–12.) He went to her first, not the church, because "[his] priority was the robbery." (*Id.* at 42:18.)

There he spoke with Ms. Ray and recalls her telling him:

> That she went in there because her mother was complaining about the noise that was going on in church. . . She went in there and when she was leaving, she was trying to take a picture. She said she was pushed down, or she was pushed, like body against body, and then when she turned around to take a picture of the pastor, the pastor snatched the phone out of her hand and didn't allow her to take a picture.

(*Id.* at 21:12–20.) He asked her why she went to the church and she admitted it was to "confront them about the music being played and if they could turn it down." (*Id.* at 21:21–22.)

After Deputy Hernandez checked in that he was on scene, Corporal Irizarry asked him for a confirmation of "what we have." (*Id.* at 18:20–21:2.) Deputy Hernandez responded that there was a confirmed robbery. (*Id.*) Deputy Hernandez also told dispatch to "dupe the calls,"—"link the calls together"—because "[Ms. Ray] was the suspect from the other call." (*Id.* at 41:18–42:8; *see also* 41:18–44:1.)

After speaking to Ms. Ray outside her house, Deputy Hernandez asked her to take him to the church so she could "show [him] where she last saw the suspect." (*Id.* at 22:22–23.) In so doing, he elected to act without waiting for backup to arrive, two other officers were on their way (*id.* at 27:20–29:1); and without going to the church first to ask them what happened, despite knowing the church placed the first 9-1-1 call reporting Ms. Ray (*id.* at 22:24–23:10; 41–44).

As Deputy Hernandez and Ms. Ray walked to the church, Deputy Hernandez saw "two black females" outside. (*Id.* at 44:2–7, 31:11–12.) He described his reaction as "oh, look. Here's one half. Here's the other half"—the halves being the two 9-1-1 calls he was

responding to. (*Id.* at 31:13–14.) So when they reached the women, Deputy Hernandez didn't greet them by asking what happened. (*Id.* at 33:10–14.) Rather, the three women started arguing. (*Id.* at 33:14–15.) Deputy Hernandez responded by turning to Witlan—the other black woman present—and saying, "Turn around and put your hands behind your back" to arrest her. (*Id.* at 34:12–18.) He did this without talking to either woman standing there, asking Ms. Ray to identify a suspect, or seeing Ms. Ray's phone anywhere. (*Id.* at 35:5–17.) Instead, his immediate reaction on approaching the two black women outside the church was to arrest one. (*Id.* at 35:5–17.)

After Deputy Hernandez attempted to handcuff Witlan, he recalled that Ms. Ray said, "She's not the one." (*Id.* at 34:16–18.) Deputy Hernandez then contended that Pastor Oniasse moved her right hand and he saw her holding a cell phone. (*Id.* at 34:21–25.) So he immediately handcuffed Pastor Oniasse without inquiry. (*Id.* at 36:7–9.) Deputy Hernandez did not tell her she was under arrest but "told her she was being detained," as he intended "[t]o continue further investigating the crime." (*Id.* at 37:14–15.) To that end, he recalled his investigatory plan as "to read her her Miranda and . . . ask her certain questions." (*Id.* at 37:16–20.) Yet he did no such thing. (*Id.* at 37:22.) Instead, once he handcuffed Pastor Oniasse, Deputy Hernandez began walking her directly to his car. (*Id.* at 40:8–10.) He recalled multiple people following them, telling him he was being recorded. (*Id.* at 40:8–10.) He said he told them, "That's fine. Just take a step back." (*Id.* at 40:12–13.) According to Deputy Hernandez, at no point did Pastor Oniasse have difficulty walking across the parking lot or fall, and there was no trouble getting her in his vehicle. (*Id.* at 38–40.) Indeed, he never pushed her or closed the vehicle's door on her legs. (*Id.* at

38–39.) Also, the vehicle's air conditioning was on when he placed Pastor Oniasse in the backseat, and she was only in the car for eight minutes. (*Id.* at 40:16–41:3.) Deputy Hernandez denied ever putting his hand on his holster and telling the crowd that if they didn't back up, he'd take out his gun; or threatening to shoot anyone. (*Id.* at 39:18–24.)

At the time Deputy Hernandez put Pastor Oniasse in his vehicle, Captain McMullen had arrived on scene. (*Id.* at 53:23–54:10.) Together, they controlled the crowd off the road and then went over to Captain McMullen's vehicle to debrief. (*Id.* at 54:7–10.) Deputy Hernandez "explained to [Captain McMullen] what [he] did," and Captain McMullen responded by "encourag[ing Hernandez] to further investigate the crime." (*Id.* at 54:10–15.) In his deposition, Deputy Hernandez did not go into what happened next, but his affidavit relayed that Pastor Oniasse "was released and unsecured from [his] patrol car, at which time [he] furthered [his] investigation." (Doc. 37-4, ¶ 6.) The affidavit said that Pastor Oniasse "then provided an account of Ms. Ray entering the church and disturbing their service by yelling and screaming," and expressed interest in prosecuting Ms. Ray. (*Id.*) Ms. Ray also provided a "written statement" and "subsequently expressed the desire not to see [Pastor] Oniasse prosecuted for the crime of robbery," so she signed a "Declaration of Intent form to memorialize her change of sentiment." (*Id.* ¶ 8.) Ultimately, no charges were filed against Pastor Oniasse, but a trespass warning was issued against Ms. Ray and "[c]harges were filed with the State Attorney's Office on Ms. Ray for disturbing a school or religious assembly and simple battery." (*Id.* ¶ 9.)

The next day, Corporal Irizarry sent an e-mail to his supervisors about this event. (Doc. 37-1, p. 46:14–19.) And although Deputy Hernandez couldn't recall its context, his

2014 yearly evaluation included a comment under "Judgment and Decision Making" that "[t]here were times where Deputy Hernandez rushed to judgment and only took the call for face value." (*Id.* at 6:17–7:9, 8:2–11.) Deputy Hernandez now works for the Orlando Police Department as a patrol officer. (*Id.* at 49:11–15.)

**C. Ms. Ray's Version**

Ms. Ray's version of events mirrors Deputy Hernandez's. (*See* Doc. 37-2.) Still, the Court recaps her account of that night.

Ms. Ray lives across the street from the Source of Life Church with her young daughter. (*Id.* at 6:6–8, 7:16–19.) At the time of this incident, her grandmother lived next door. (*Id.* at 58:18–24.) And before August 21, 2014, Ms. Ray had frequently phoned the police to make noise complaints about the church's evening services—"about 12, 13 times." (*Id.* at 57:22.) So on that day, something snapped and Ms. Ray decided to take matters into her own hands. (*See id.* at 57:24–58:15.) Earlier that evening, she had been drinking. (*Id.* at 26:25–27:2.) When the music started getting "very loud" after 10:00 p.m. she took her daughter and walked over to the church, per her grandmother's request.[3] (*Id.* at 8:7–17.)

She walked into the church, down a long hallway to a group of people standing. (*Id.* at 9:21–25.) In an aggravated, nervous state, she asked them to "turn this down." (*Id.* at 9:24, 10:4–10.) She said they "pushed her in this room where these people were like flopping around like fish or something, on the floor," which "was just very loud and very

[3] Contrary to Pastor Oniasse's account, Ms. Ray's deposition did not report multiple trips to the church. (*See* Doc. 37-2.)

strange." (*Id.* at 9:25–10:3.) There, Ms. Ray said Pastor Oniasse pushed her so she "told [her] daughter to run and tell her grandmother to call 9-1-1." (*Id.* at 11:17–18.) Her daughter left so Ms. Ray, "trying to get out of there," tried to "pocket call" 9-1-1 with her phone still in her pocket (*Id.* at 11:23–25.) As she backed out of the room, she took her phone out to snap a picture of Pastor Oniasse. (*Id.* at 11:17–12:2, 18:9–21:11.) When she did so, Ms. Ray recalled that Pastor Oniasse grabbed it and scratched her hands. (*Id.* at 14:12–17.) To that, Ms. Ray "was like, 'Give me my phone back.' [a]nd . . . just got the heck out of there and went to my grandma's." (*Id.*) She then called 9-1-1 from her grandmother's house. (*Id.* at 16:12–13.)

On that 9-1-1 call, Ms. Ray told the dispatcher that she already called 9-1-1 about the church and the lady that pushed her. (*Id.* at 17:18–23.) She reported that her daughter went with her across the street and a lady took her phone. (*Id.* at 23:1–26:19, 27:13–28:16.) She specifically told the dispatcher that "[the lady] stole my phone." (*Id.* at 28:14.)

While she was on the phone, Deputy Hernandez arrived on the scene. (*Id.* at 28:21–29:4.) She recalled telling him what happened and him asking her if she wanted to prosecute the person who took her phone. (*Id.* at 30:14–21.) But he didn't ask her to describe the appearance of the person who took her phone. (*Id.* at 30:7–9.) They then "went to get [her] phone." (*Id.* at 30:22–24.)

Walking up to the church, Ms. Ray recalled seeing "[t]wo females, one being [Pastor] Oniasse." (*Id.* at 31:13–18.) When they arrived, Ms. Ray remembered Deputy Hernandez "was going to put the handcuffs on the other lady." (*Id.* 32:7–21.) So Ms. Ray said, "That's not her. It's her," pointing to Pastor Oniasse. (*Id.* at 32:7–15.) She recalled

that both women were black and it was dark, so "they all looked alike to [her]." (*Id.* at 32:16–21; *see also id.* at 68:10–69:9.) According to Ms. Ray, Pastor Oniasse "said she had [Ms. Ray's] phone," and Ms. Ray saw Pastor Oniasse "in possession" of her phone. (*Id.* at 33:11–20.) Somehow Deputy Hernandez got the phone and then told Ms. Ray to go back across the street because of the crowd, who she claimed were "ranting and raving." (*Id.* at 33:13–16.) So she left, back to her grandmother's. (*Id.* at 34:17–22.) "[C]haos" ensued, as "everybody was screaming and yelling and videoing." (*Id.* at 34:14–35:1.) She didn't see Deputy Hernandez handcuff Pastor Oniasse or place her in his vehicle. (*Id.* at 33:21–24, 35:19–36:1.) She recalled hearing him telling the crowd to back up and stay away, but didn't remember: (1) hearing him use profanity or racial slurs; (2) Deputy Hernandez drawing his gun at the crowd; (3) him threatening to shoot; (4) seeing Pastor Oniasse fall; (5) or Deputy Hernandez using any force on Pastor Oniasse. (*Id.* at 39:9–41:1.)

During "all the chaos," another officer arrived and the situation defused. (*Id.* at 42:20–44:1.) "[E]verything had changed." (*Id.* at 44:1.) The arriving officer spoke to Deputy Hernandez and came to talk to Ms. Ray. (*Id.* at 44:4–11.) They both told her that she "could get in trouble for going on the property, and that [Pastor Oniasse] was going to press charges against [Ms. Ray] for going on the property, unless [Ms. Ray] drop[ped] the charges for her taking the phone." (*Id.* at 44:4–9.) In her words, "everything had just changed and then everybody's calming down." (*Id.* at 44:9–11.) The tables were turned—because the "other higher ranking officer appeared," Ms. Ray was "now the subject of a potential criminal charge . . . whereas before, when [she] interacted with Deputy Hernandez, it was directed towards [Pastor] Oniasse being the subject of the criminal

charge." (*Id.* at 46:16–47:2.) That officer told Ms. Ray that she was "not allowed to go over [to the church], at any reason [sic]." (*Id.* at 47:5–8.) Since she had gone onto the property, that officer told Ms. Ray that she "was going to go to jail"—Pastor Oniasse would press charges if Ms. Ray didn't drop the robbery charges. (*Id.* at 47:10–16.) In the end, Ms. Ray dropped the charges, after which Deputy Hernandez returned her phone to her. (*Id.* at 47:10–48:19.) Ms. Ray "was done." (*Id.* at 48:17.)

### D. This Action

This action originated in state court on May 8, 2017 with Pastor Oniasse, then represented by counsel, bringing three claims against Deputy Hernandez. (Doc. 2.) After answering (*see* Doc. 3), Deputy Hernandez removed the action to this Court on July 6, 2017 on the basis of federal-question and supplemental jurisdiction. (Doc. 1.) Pastor Oniasse twice amended her complaint, now bringing claims against Deputy Hernandez and Orange County Sheriff Jerry Demings in his official capacity. (*See* Docs. 19, 29.) Following a failed attempt at mediation (Doc. 32), Pastor Oniasse's attorney successfully moved to withdraw from representation, citing irreconcilable differences. (Docs. 33, 35, 36.) Pastor Oniasse hasn't acquired new representation since, and following Defendants' Motion, failed to submit a response, despite the Court issuing a *Milburn* order granting her additional response time. (*See* Doc. 38.) Thus, the Motion is ripe.

## II. LEGAL STANDARDS

Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As to issues for

which the movant would bear the burden of proof at trial, it must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the nonmoving party on all of the essential elements of its case. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citing *United States v. Four Parcels of Real Prop. in Green & Tuscaloosa Ctys*, 941, F.2d 1428, 1438 (11th Cir. 1991)).

As to issues for which the nonmovant would bear the burden of proof at trial, the movant has two options: (1) it may simply point out an absence of evidence to support the nonmoving party's case; or (2) it may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Four Parcels*, 941 F.2d at 1438 (citing *Celotex Corp.*, 477 U.S. at 325). "The burden then shifts to the nonmoving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant, *Battle*, 468 F.3d at 759, such that "when conflict arises between the facts evidenced by the parties, [the] court credit[s] the nonmoving party's version," *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005). However, "[the] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon

which the nonmovant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. Discussion

Pastor Oniasse brings two Fourth Amendment claims under § 1983 against Deputy Hernandez based on his conduct on August 21, 2014: (1) he exercised unreasonable and excessive force on her person; and (2) he falsely arrested and detained her without probable cause and without a warrant. (Doc. 29, ¶¶ 42–50.) She also brings state-law claims for battery and false arrest/detention against Sheriff Demings in his official capacity. (*Id.* ¶¶ 51–60.) For the federal claims, Defendants invoke the protection of qualified immunity, claiming that the force Deputy Hernandez used was reasonable under the circumstances and that Deputy Hernandez had actual probable cause to arrest Pastor Oniasse. (Doc. 37, pp. 9–22.) For the state claims, Defendants point out that Pastor Oniasse failed to provide presuit notice as required to pursue these claims, so they are time-barred; and the claims also fail because Deputy Hernandez's actions were reasonable and supported by probable cause. (*Id.* at 22–24.) Starting with the federal claims, the Court tackles these arguments below.

### A. Qualified Immunity for Federal Claims

Qualified immunity completely protects government officials sued in their individual capacities so long as their conduct is pursuant to their discretionary authority

and does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir. 2002) (internal quotation marks omitted) (quoting *Thomas v. Roberts*, 261 F.3d 1160, 1170 (11th Cir. 2001)). "A government official asserting a qualified immunity defense bears the initial burden of showing 'he was acting within his discretionary authority.'" *Cozzi v. City of Birmingham*, 892 F.3d 1288, 1293 (11th Cir. 2018) (quoting *Lee*, 284 F.3d at 1194), *cert. denied sub nom. Thomas v. Cozzi*, No. 18-368, 2018 WL 4539139 (Oct. 15, 2018). In this case, it is undisputed that Deputy Hernandez was acting in his discretionary authority when he handcuffed and detained Pastor Oniasse. Thus, the burden shifts to Pastor Oniasse to demonstrate that, with the facts viewed in her favor, Deputy Hernandez: (1) violated her constitutional rights; and (2) those rights were clearly established at the time of the violation. *Id.* (citing *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008)). Viewing the facts in Pastor Oniasse's favor, the Court concludes that Deputy Hernandez is not entitled to qualified immunity for the false arrest/detention claim but is entitled to qualified immunity for the excessive force claim.

**1. False Arrest/Detention**

The Fourth Amendment is violated when a warrantless arrest is made without probable cause. *Id.* (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "Probable cause exists 'when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (citing *Lee*, 284 F.3d at 1195). In the § 1983 context, qualified

immunity protects an officer if arguable probable cause exists, as opposed to actual probable cause. *Id.* at 1293–94 (citing *Durruthy v. Pastor*, 351 F.3d 1080, 1089 (11th Cir. 2003)). "This standard acknowledges that 'law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable.'" *Turner v. Jones*, 415 F. App'x 196, 199 (11th Cir. 2011) (quoting *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990)).[4]

"Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendant could have believed that probable cause existed to arrest." *Cozzi*, 892 F.3d at 1294 (alteration in original) (quoting *Rushing v. Parker*, 599 F.3d 1263, 1266 (11th Cir. 2010)). It is an objective standard; the officer's underlying intent or motivation is irrelevant. *Lee*, 284 F.3d at 1195. "Importantly, in evaluating probable cause, an officer may not 'unreasonably disregard[] certain pieces of evidence' by 'choos[ing] to ignore information that has been offered to him or her' or 'elect[ing] not to obtain easily discoverable facts' that might tend to exculpate a suspect." *Cozzi*, 892 F.3d at 1294 (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1229, 1233 (11th Cir. 2004)). After all "[w]hether a reasonable officer could have believed he had probable cause to arrest 'depends on the totality of the circumstances.'" *Id.* (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)).

---

[4] While unpublished opinions are not binding precedent, they may be considered as persuasive authority. *See* 11th Cir. R. 36-2; *see also United States v. Almedina*, 686 F.3d 1312, 1316 n.1 (11th Cir. 2012).

Here, Defendants submit that "a reasonable officer in the same circumstances and possessing the same knowledge as Deputy Hernandez could have believed that probable cause existed to arrest [Pastor] Oniasse for robbery." (Doc. 37, p. 20.) Defendants base this conclusion on these facts they offer from the record: (1) Deputy Hernandez was dispatched to Ms. Ray's grandmother's house to investigate a robbery call; (2) on arrival, Deputy Hernandez spoke to Ms. Ray, and she told him that she walked over to the church and that when she tried taking a picture of Pastor Oniasse, Pastor Oniasse pushed her down and stole her phone; (3) Deputy Hernandez walked to the church where Ms. Ray positively identified Pastor Oniasse; and (4) Pastor Oniasse admitted she was involved in an altercation with Ms. Ray. (*Id.* at 20–21.)

Now, if this sequence of events were all that happened on August 21, 2014, surely Defendants would establish the existence of arguable probable cause. But it's not. Defendants' picture leaves an unfinished canvas—when the full palette is used, a pointillistic portrait emerges.

The record before this Court, viewed in Plaintiff's favor, establishes the following[5]: While on patrol in the Pine Hills area on August 21, 2014, Deputy Hernandez first received a call from the Source of Life Church about a suspicious person—a white woman who came storming into the church, disrupting evening service. Deputy Hernandez took the call. While en route to respond, another call came in about a robbery near the church—a woman reported her cell phone had been stolen by someone in the church. Deputy

[5] *See supra* Section II.A.

Hernandez heard the call and told the dispatcher to "break him" from the suspicious person call so he could take the robbery call. Once he did that, Deputy Bishop got on the radio to report that the two calls might be related, so Deputy Hernandez arrived on scene armed with that insight.

Deputy Hernandez then went directly to Ms. Ray's house and spoke with her. She was safe. He took her with him across the street so she could identify the suspect. While walking, they both noticed two black females outside. Ms. Ray didn't identify either of them as the phone-grabber before she and Deputy Hernandez reached them. Once in front of the two women, Deputy Hernandez attempted to handcuff Witlan, the other black female. Witlan and Pastor Oniasse interjected, and Deputy Hernandez asked who had the altercation with Ms. Ray.[6] Pastor Oniasse responded that she did. She was not holding Ms. Ray's phone at the time. Without saying or asking anything else, Deputy Hernandez handcuffed Pastor Oniasse and started leading her away.

When placing Pastor Oniasse in his vehicle, Deputy Hernandez's supervisor arrived on scene—Captain McMullen. They controlled the crowd together, and Captain McMullen asked Deputy Hernandez what he had done. Deputy Hernandez told him, and Captain McMullen informed him that more investigation was needed. Captain McMullen then released Pastor Oniasse from custody. He spoke to Pastor Oniasse to hear

---

[6] Deputy Hernandez and Ms. Ray recall this differently—that Ms. Ray stopped Deputy Hernandez from handcuffing Witlan and pointed out Pastor Oniasse. *See supra* Section II.B.–C. Then they noticed Pastor Oniasse holding Ms. Ray's cell phone, so Deputy Hernandez handcuffed her. *See id.* Again, the Court must accept Pastor Oniasse's version at this stage.

what happened, along with Deputy Bishop who had joined the scene. They apologized to Pastor Oniasse, told her that Deputy Hernandez was new, and asked her if she wanted to press charges against Ms. Ray. They also talked to Ms. Ray, informing her that she wasn't supposed to go in the church and could go to jail for her actions. The evening concluded with charges filed against Ms. Ray, not Pastor Oniasse.

With this, the Court finds that the totality of the circumstances do not favor Deputy Hernandez's actions. *See Cozzi*, 892 F.3d at 1294–95. Indeed, a reasonable officer in Deputy Hernandez's circumstances, possessing the same knowledge, could not have believed that probable cause existed to arrest Pastor Oniasse for robbery.[7] Rather, on this record, Deputy Hernandez "chose to ignore information that ha[d] been offered to him" and "elected not to obtain easily discoverable facts" before handcuffing and detaining Pastor Oniasse. *See Kingsland*, 382 F.3d at 1231. Several facts drive this conclusion home.

For starters, Deputy Hernandez ignored the relation between the calls. This is something a reasonable officer would not have done (and actually didn't because Deputy Bishop pointed this out on the radio). This connection was critical to understanding what happened leading up to the alleged robbery—that the person who claimed her phone was stolen had just gone into the church to complain and was told to leave because the church called the police on her. Such knowledge adds quite the different tinge to Ms.

---

[7]Under Florida law, robbery is "the taking of money or other property which may be the subject of larceny from the person or custody of another, with intent to either permanently or temporarily deprive the person or the owner of the money or other property, when in the course of the taking there is the use of force, violence, assault, or putting in fear." Fla. Stat. § 812.13.

Ray's account of events, certainly staining its reliability. *Cf. Cozzi*, 892 F.3d at 1295 (discussing officers' obligations to assess and establish the reliability of tips before acting on them, including from anonymous sources). But ignoring the first call allowed Deputy Hernandez to rely on Ms. Ray's account hook, line, and sinker. This enabled him to charge the two black women he saw outside Source of Life Church and indiscriminately attempt to handcuff one. In so doing, Deputy Hernandez's actions strayed from those of a reasonable officer.

What's more, Deputy Hernandez elected not to obtain easily discoverable facts—Pastor Oniasse's account or Witlan's or anyone else on scene. According to Pastor Oniasse, all he asked was who had an "altercation" with Ms. Ray before handcuffing her—nothing about the earlier suspicious person call or Ms. Ray's cell phone, which Pastor Oniasse maintains she wasn't holding at the time. In Pastor Oniasse's version, Deputy Hernandez didn't ask Ms. Ray to identify the phone-grabber—it was Pastor Oniasse who volunteered herself as having the "altercation" with Ms. Ray after Deputy Hernandez attempted to handcuff her parishioner. And she did have the altercation—after all, Deputy Hernandez at that point knew Ms. Ray instigated the disturbance at the church. So all Deputy Hernandez had for "probable cause" at the time he handcuffed Pastor Oniasse was the 9-1-1 call, Ms. Ray's suspect account, and Pastor Oniasse's admission that she was involved in the earlier "altercation." To the Court, such scant evidence belies arguable probable cause.

Last, that Deputy Hernandez acted unreasonably in handcuffing and detaining Pastor Oniasse in these circumstances is undergirded by the actions of the other officers

who joined him on scene—they adopted the reverse approach, which was undoubtedly "reasonable." Unlike Deputy Hernandez, they assessed the scene by releasing Pastor Oniasse from custody and speaking to her so she could recount the evening. They also spoke to Ms. Ray to hear her version. They asked whether security camera footage existed, spoke with everyone at the scene, looked for the phone, and asked both parties to submit written statements. Only then did they act—issuing a trespass warning against Ms. Ray and filing no charges against Pastor Oniasse. This tack was reasonable given the totality of these circumstances. Deputy Hernandez went his own way.

All in all, on this record, Deputy Hernandez elected to act fast without sufficient basis to support his actions. "Under [binding] precedent, this failure was unreasonable." *Cozzi*, 892 F.3d at 1297. "Where a police officer 'unreasonably disregarded certain pieces of evidence to establish probable cause or arguable probable cause, . . . reasonable officers in the same circumstances and possessing the same knowledge as the [officer] could not have believed that probable cause existed to arrest the plaintiff." *Id.* (alteration in original). Rather than verifying Ms. Ray's account "through independent investigation," and analyzing her narrative through the lens of the first call, Deputy Hernandez "turn[ed] a blind eye to evidence suggesting that [Pastor Oniasse was] innocent." *Id.* Under the totality of these circumstances, Deputy Hernandez thus lacked arguable probable cause to handcuff and detain Pastor Oniasse.

Having established that Deputy Hernandez lacked arguable probable cause to arrest Pastor Oniasse for robbery, the second step of the qualified immunity analysis "is, in the context of this case, straightforward: [Eleventh Circuit] binding precedent clearly

established, at the time of [Pastor Oniasse's] arrest, that an arrest made without arguable probable cause violates the Fourth Amendment's prohibition on unreasonable searches and seizures." *Id.* (quoting *Skrop v. City of Atlanta*, 485 F.3d 1130, 1143–44 (11th Cir. 2007)) (alterations added). As Deputy Hernandez handcuffed and detained Pastor Oniasse without arguable probable cause, Deputy Hernandez violated clearly established law. *See id.* Therefore, Deputy Hernandez is not entitled to qualified immunity on Pastor Oniasse's false arrest/detention claim. Summary judgment is denied for this claim.

**2. Excessive Force**

Next, the Court turns to Pastor Oniasse's claim that Deputy Hernandez violated the Fourth Amendment by subjecting her to excessive force. In the Second Amended Complaint, Pastor Oniasse asserts two legal theories for this claim. (Doc. 29, ¶¶ 42–47.) First, because Deputy Hernandez illegally arrested her, any force was excessive. (*Id.* ¶ 44.) Alternatively, even if the arrest were legal, Deputy Hernandez used excessive force while arresting her. (*Id.* ¶ 45.) The Court takes each in turn.

For the first theory, "it is well-established that if no probable cause authorizes an arrest, *any* use of force to effectuate the unlawful arrest is a violation of the Fourth Amendment." *Turner*, 415 F. App'x at 201 (citing *Bashir v. Rockdale Cty., Ga.*, 445 F.3d 1323, 1331–33 (11th Cir. 2006)); *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008)); *see also Williams v. Sirmons*, 307 F. App'x 354, 360–62 (11th Cir. 2009). So a plaintiff's damages for unlawful arrest "include damages for any injury, pain and suffering, and mental anguish caused by the force used to effect that false arrest, regardless of whether the force would have been reasonable or excessive had there been probable cause." *Turner*, 415 F. App'x

at 201 (citing *Williamson v. Mills*, 65 F.3d 155, 158–89 (11th Cir. 1995)). As the Court just concluded that no probable cause authorized Pastor Oniasse's handcuffing and detention for robbery, her claim that Deputy Hernandez's force was excessive because he illegally detained her cannot proceed on its own. *Id.* Rather, this claim "is part of the unlawful arrest claim. It is not a separate and distinct claim." *Id.* (citing *Bashir*, 445 F.3d at 1332 ("[W]here an excessive force claim is predicated solely on allegations the arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim.")). Thus, Pastor Oniasse's excessive force claim stalls on these grounds.

Beyond that theory though, Pastor Oniasse plucks out specific acts by Deputy Hernandez that she claims demonstrate excessive force no matter what. (Doc. 29, ¶¶ 23, 26, 29–33, 45; *see also, e.g.*, Doc. 40-2, pp. 223–27 (Pastor Oniasse's deposition testimony).) So the Court examines whether, assuming probable cause did exist, qualified immunity entitles Deputy Hernandez to summary judgment for this "discrete excessive force claim." *See Turner*, 415 F. App'x at 201.

Under the Fourth Amendment, an officer may not use excessive force "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Lee*, 284 F.3d at 1197. The Fourth Amendment objective "reasonableness" standard governs this inquiry: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 486 U.S. at 396–97. This includes assessing "the severity of the crime at issue, whether the suspect poses

an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. At bottom, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion of threat thereof to effect it." *Id.* Of course, there are limits. Under Eleventh Circuit precedent, "officers may not use substantial force to apprehend a nonthreatening suspect who has committed only a minor offense and is not resisting arrest." *Johnson v. White*, 725 F. App'x 868, 876 (11th Cir. 2018) (first citing *Graham*, 490 U.S. at 396; and then citing *Hadley*, 526 F.3d at 1330).

Now, Pastor Oniasse's account of the events on August 21, 2014 charges Deputy Hernandez with using excessive force. (Doc. 40-2.) She stated that he painfully handcuffed her, pushed her, caused her to fall and hurt her knees while walking across the parking lot, slammed his car door repeatedly on her left leg, and used his foot to push her inside his vehicle. (*Id.* at 223–27.) At the same time, she admits that a crowd had formed outside, following Deputy Hernandez as he took her to his vehicle. (*Id.* at 198–200.) Deputy Hernandez disputes Pastor Oniasse's account, but the Court must view the record in Pastor Oniasse's favor. Yet even still, Pastor Oniasse's excessive force claim fails, as explained below.

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (citation and quotation marks omitted). "For even minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 740 (11th Cir. 2010) (citing *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000));

*see also Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002) ("Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal."). And under the totality of these circumstances, as told by Pastor Oniasse, Deputy Hernandez's use of force was not excessive. Perhaps careless but still permissible.

Sans question, Deputy Hernandez faced circumstances that were "tense, uncertain, and rapidly evolving"—with a crowd of unhappy (to say the least) parishioners chastising Deputy Hernandez for handcuffing their pastor. So to quickly secure her, Deputy Hernandez briskly walked Pastor Oniasse across the parking lot, where she fell in a dip. He picked her up, pushed her to keep moving, and placed her—albeit haphazardly—in the back of his vehicle. He then attempted to close the car door with her left leg lingering outside, so he pushed her leg in with his foot. There he left her, without air conditioning, while waiting for backup. When they arrived, she was released.

Taking this all into account, the Court finds that Deputy Hernandez's use of force was not unconstitutional. *Cf. Nolin*, 207 F.3d at 1257–58. Accordingly, Deputy Hernandez is entitled to qualified immunity on Pastor Oniasse's discrete excessive force claim. *See id.* at 1258; *see also Williams*, 307 F. App'x at 360–62. Summary judgment is thus appropriate for this claim.

**B. Presuit Notice for State-Law Claims**

Other than her two federal claims against Deputy Hernandez, Pastor Oniasse brings two state-law claims under Florida law for battery and false arrest/detention against Sheriff Jerry Demings in his official capacity. (Doc. 29, ¶¶ 51–60.) "A suit against a defendant in his official capacity is, in actuality, a suit against the governmental entity

which employs him." *Stephens v. Geoghegan*, 702 So. 2d 517, 527 (Fla. 2d DCA 1997) (first citing Fla. Stat. § 768.28(9)(a); and then citing *Dep't. of Educ. v. Roe*, 679 So. 2d 756, 759 (Fla. 1991)). Florida has waived sovereign immunity for certain torts, but:

> An action [bringing such a claim] may not be instituted against the state or one of its agencies or subdivisions unless the claimant presents the claim in writing to the appropriate agency, and also, . . . presents such claim in writing to the Department of Financial Services, within 3 years after such claim accrues and the Department of Financial Services or the appropriate agency denies the claim in writing.

Fla. Stat. § 768.28(6)(a). This notice provision is "strictly construed, with strict compliance being required." *Maynard v. State, Dep't of Corr.*, 864 So. 2d 1232, 1234 (Fla. 1st DCA 2004).

Here, the Second Amended Complaint alleges that Pastor Oniasse "has complied with all conditions precedent in accord with [Fla. Stat.] § 768.28." (Doc. 29, ¶¶ 51, 56.) Pastor Oniasse's deposition testimony does not speak to this issue. (Docs. 40-1, 40-1.) Yet Defendants submitted the affidavit of a records custodian from Florida's Department of Financial Services who searched the Department's records for a Notice of Claim filed by Pastor Oniasse regarding the August 21, 2014 incident and found nothing. (Doc. 37-5, ¶ 4.) The affidavit was sworn May 11, 2018, well after Pastor Oniasse's three-year statutory period for filing her claim closed. (*Id.*) Thus, the record establishes that Pastor Oniasse did not comply with Florida's presuit notice requirement, contrary to her allegations. The Court cannot ignore such evidence, which bars both state-law claims from proceeding. *Cf. Infante v. Whidden*, No. 2:12-cv-41-FtM-29UAM, 2013 WL 5476022, at *7–8 (M.D. Fla. Sept. 30, 2013) (granting motion to dismiss on claims where the plaintiff failed to comply with Florida's presuit notice requirement). Thus, the Court need not reach Defendants'

additional dismissal arguments for these claims, and summary judgment will be granted on these State law claims.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**:

   a. The Court **GRANTS** summary judgment on Counts I, III, and IV of the Second Amended Complaint (Doc. 29, ¶¶ 42–47, 51–60).

   b. The Court **DENIES** summary judgment on Count II of the Second Amendment Complaint (Doc. 29, ¶¶ 48–50).

2. The Clerk is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff with respect to Counts I, III, and IV (Doc. 29, ¶¶ 42–47, 51–60).

3. This matter will proceed to trial on Count II (Doc. 29, ¶¶ 48–50).

**DONE AND ORDERED** in Chambers in Orlando, Florida, on December 3, 2018.

ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record
*Pro se* party